# St. Louis Southwestern Ry. Co. v. The Elgin Condensed Milk Co.

1.   AGENCY—*How Proven.*—An agency may be proven by the agent himself if he will testify to his employment, or to such a course of conduct or dealings as will justify the presumption of his authority to act and bind his principal, or it may be proven by acts or words of ratification by the principal.

2.   SAME—*When the Principal is Liable for Unauthorized Acts.*—If an act performed by an agent under ordinary circumstances be within the apparent authority delegated to him, a person dealing with such agent in good faith, on the faith of his apparent powers and without notice of facts showing that the act was unauthorized, may hold the principal, whether the act was authorized or not.

3.   SAME—*What Will Constitute a General Agent.*—Power to act generally in a particular business or a particular course of trade in a busi-

ness, however limited, will constitute a general agency, if the agent is so held out to the world, however restricted his private instructions may be.

4. SAME—*Questions of Fact for the Jury.*—The question as to whether certain goods were shipped upon a bill of lading or under a prior parol contract covering future shipments, is a question of fact for the jury.

5. BILLS OF LADING—*Evidence Under a Previous Parol Contract.*— When goods are shipped under a parol contract covering future shipments, bills of lading given by the carrier are only evidence of the dates and amounts of shipments made under the pre-existing contract.

6. COMMON CARRIERS—*Of Goods Received from Other Carriers for Further Transportation.*—When a contract exists between a consignor and a carrier to transport goods to a point beyond his line, the carrier receiving the goods at the end of the line for the purpose of transporting them to their destination and delivering them there, becomes the agent of the carrier receiving the goods from the consignor for shipment, for the purposes of further transportation and delivery.

**Assumpsit**, on contract for transportation. Appeal from the Circuit Court of Alexander County; the Hon. JOSEPH P. ROBARTS, Judge, presiding. Heard in this court at the August term, 1897. Affirmed. Opinion filed March 1,1898.

GREEN & GILBERT, attorneys for appellant.

WILLIAM N. BUTLER and ANGUS LEEK, attorneys for appellee.

A common carrier has power to make a contract to carry to a place beyond the terminus of his route and to render himself liable as such for the whole distance. All connecting carriers in such case become his agents, for whose negligence or other default he is responsible, and he has no more power to evade by contract the consequences of their negligence than he can the results of his own. Hutchinson on Carriers, Ch. 4, page 117; Illinois C. R. R. Co. v. Frankenberg et al., 54 Ill. 88.

It is universally conceded that he may bind himself by an express contract to carry to any distance or to any destination, whether the carriage can be accomplished by his own route or will require the employment of agents or subsidiary carriers beyond it.

MR. JUSTICE WORTHINGTON DELIVERED THE OPINION OF THE COURT.

Appellee manufactures condensed milk at Elgin, Illinois,

and sells a part of its product at Galveston, Texas. From Elgin to Galveston there is railroad connection via Chicago & Northwestern from Elgin to Dixon, Illinois; Illinois Central R. R. Co. from Dixon to Cairo; St. Louis Southwestern Railway Co.—appellant's line—known as the "Cotton Belt" —from Cairo, via Bird's Point, Mo., and Texarkana, Texas, to Tyler, Texas; and International & Great Northern R. R. Co. from Tyler to Galveston.

There were three shipments of milk claimed to be damaged.

There are six counts in the declaration, two counts, respectively, for each shipment. The right of action in each count is based upon an alleged parol agreement, which agreement is set out in the first, third and fifth counts, in substance, as follows:

That defendant was a common carrier and operated a railroad line in Cairo, in connection with a railway from Bird's Point, Mo., through part of Texas, and kept an office at Cairo; that, by its authorized agent, in consideration of plaintiff's shipping its milk from Elgin over Chicago & Northwestern Railway to Dixon, thence over Illinois Central to Cairo, that it might be transported to destination by defendant, it agreed to furnish plaintiff refrigerator cars at Elgin, and that the milk, when loaded therein by plaintiff, and received by defendant at Cairo, should not be removed therefrom, but should be transported in said cars by defendant over its lines and other lines to place of destination.

Counts two, four and six state the agreement in substance as follows: Defendant agreed that in consideration that plaintiff would cause same to be delivered to defendant at Cairo, defendant would furnish plaintiff at Elgin refrigerator cars in which to load milk to be delivered in such cars to defendant at Cairo, and would receive milk in such cars and carry same to destination, and not remove milk from such cars or suffer same to be done until same had reached destination.

The declaration charges that, in pursuance of said agreement, defendant furnished three Illinois Central refrigerator

cars, in which plaintiff made certain shipments of milk from Elgin to Galveston, viz., shipment June 6, 1893, 400 cases milk, value $1,305, Illinois Central Refrigerator Car 16210, delivered to defendant at Cairo June 11, 1893; shipment May 6, 1893, 380 cases milk, value $1,300, Illinois Central Refrigerator Car 16346, delivered to defendant at Cairo, May 11, 1893; shipment June 27, 1893, 410 cases milk, Illinois Central Refrigerator Car 16481, delivered to defendant at Cairo June 29, 1893; that defendant received said cars under the contract at Cairo, but that instead of sending them through to destination without trans-shipment, and in violation of its contract, defendant transferred the milk from refrigerator cars into box cars, and then sent it to Galveston, whereby it was damaged, etc.

Defendant pleaded non-assumpsit. Judgment was rendered for $2,253.90 damages and costs of suit.

In passing upon this case the following propositions are to be considered:

1st. Was contract made as alleged, and milk shipped at Elgin in refrigerator cars under said contract?

2d. Was the milk delivered to appellant at Cairo in refrigerator cars, and by appellants changed to box cars, and in them carried to Galveston?

3d. Was the milk damaged by such change, and if so what amount?

That the milk was loaded in Illinois Central refrigerator cars at Elgin, that it was received by appellant in said cars at Cairo, and that it was subsequently changed to box cars and in them carried to Galveston, are allegations of the declaration clearly proved.

Was the milk in good condition when shipped at Elgin? Appellees sought to prove this by witnesses testifying to the method and care used in manufacturing and the tests for quality applied to sample cans taken from " batches " when manufactured, each " batch " being uniform throughout in quality. The objections to this testimony were properly overruled. It was pertinent for the purpose offered. Its probative value was for the jury to determine.

Sample cans taken from the "batches" from which the milk in question was shipped, were examined after its manufacture. Sample cans of the shipments so taken were kept at the factory and were examined after complaints were received from Galveston. The testimony is that these sample cans, at each examination, contained good milk. In the absence of testimony to the contrary the jury was warranted, from such showing, in finding that the milk was good when shipped.

Did appellant contract, as alleged, to carry the milk to its destination in refrigerator cars and without change?

If such contract was made, it was made on appellant's part by C. A. Shank, as its agent. This involves the question of his agency. He testifies:

"I am commercial agent of the St. Louis Southwestern Railway, at Chicago." On cross-examination: "I have been commercial agent for the defendant five years the tenth of next month. The meaning of the heading of this letter—'general agent'—is that I handle passenger as well as freight business. First saw employes of plaintiff March, 1893. Had title of general agent at that time."

He was further asked: "You were at that time—January 4, 1893, date of letter—general agent?"

Ans. "I was whatever that letter says."

Q. "You had the power to enter into arrangements with people, did you?"

Ans. "At certain rates, arrangements only—not a contract."

The letter referred to by Mr. Shank is as follows:

"Cotton Belt Route.

C. C. Shank, General Agent.

L. D. Knowles, Trav. Freight Agent.

W. A. Newell, Contracting Agent.

Office of General Agent St. Louis Southwestern Railway Co; St. Louis Southwestern Railway Co. of Texas; Tyler Southeastern Railway Co.; Room 4, The Rookery, Telephone Main 3956.

CHICAGO, ILL., Jan. 4, 1893.

ELGIN CONDENSED MILK Co., Elgin, Ill.

Gentlemen : I am to-day in receipt of a telegram from our representative in Texas, advising that Mr. Ujffy, of Galveston, Texas, has ordered a car of milk from you, and kindly requested that the same be routed via the Cotton Belt. I trust my information is correct and that you can advise me it will be consistent for you to favor our line with the shipment, routing same in our care either at East St. Louis or Cairo. Thanking you for past favors and hoping for a prompt and favorable reply as regards this shipment, I am                        Yours truly,

C. A. SHANK, General Agent."

Mr. Shank also testifies that he had under him L. D. Knowles, traveling freight agent, and W. A. Newell, contracting agent, and L. J. Marcus, stenographer.

Emory B. Watson, for twenty-five years agent of the N. W. R. R. at Elgin, who, from his business connections with railroad men, would be likely to know the general agents of important lines, with offices at Chicago, testified that he understood Mr. Shank to be the general or commercial agent of the Cotton Belt Railway.

" Agency may be proven by the agent himself, if he will testify to his employment, or to such a course of conduct or dealing as will justify the presumption of the agent's authority to act and bind his principal." Porter v. Robertson, 34 Ill. App. 74; Greenleaf, Vol. 2, Sec. 63.

" Power to act generally in a particular business or a particular course of trade in a business, however limited, would constitute a general agency, if the agent is so held out to the world, however restricted his private instructions may be." Crain et al. v. First National Bank, 114 Ill. 516.

" The general rule is established that if an act performed by an agent under ordinary circumstances be within the authority delegated to the agent, a person dealing with him, in good faith, on the faith of his apparent powers, and without notice of facts showing that the act was unauthorized, may hold the principal liable, whether the act was authorized

or not." Morawetz on Corporations, Vol. 2, Sec. 597, cited in McDonald v. Chisholm, 131 Ill. 273.

Shank had been agent for defendant for nearly five years. He publicly advertised himself as a general agent, both for passengers and for freight. He had an office in a prominent building in Chicago, with a traveling freight agent and a contracting agent under him. It is not likely that he could so act at a great commercial center without the knowledge of his principal. If he thus publicly acted, with the knowledge of his principal, and was authorized to solicit freight and make "*arrangements*," as he testifies, parties dealing with him were warranted in concluding that he had authority to contract. "Arrangements," used in this sense, means "stipulations; conditions of adjustment." Am. Ency. Dict.

The distinction between the authority of one advertised as a general agent for freight and passengers, to make *arrangements* with shippers of freight, but not to contract, is too refined for legal discrimination.

What facts constitute an agent is a question of law. Whether or not the facts are proved is a question for the jury. The question, then, of Shank's agency, was a mixed question of law and fact, to be decided by the jury. The finding that a contract was made by appellant involves a finding that Shank, as agent, was authorized to make the contract. We think the evidence warranted the jury in so finding.

This suit is not based upon the bills of lading, duplicates of which are in evidence. It is based upon an alleged parol contract, covering future shipments to be made via the Cotton Belt route. The bills of lading are only evidence of dates and amounts of shipments made under an alleged pre-existing parol contract.

Upon the issue as to whether there was a previous parol contract, the evidence is conflicting.

C. A. Shank testifies, in substance, that he called on plaintiff at Elgin, in March, 1893, to solicit business; that he also solicited business by letter and "through my traveling freight agent, L. D. Knowles;" that he had the title of gen-

eral agent at that time; that they advised him that they were shipping *in a very satisfactory manner* at that time, by the way of the M., K. & T. in refrigerator cars and did not know any reason for changing. He says: "I did not put it as strong as that they should get as good service." "I admit saying that I would try to give them the same kind of cars they were getting over other roads." "I did not tell them through service from Elgin in ventilator or refrigerator cars." "I had a conversation with Mr. Watson, the substance of which was that I had made arrangements with Condensed Milk Company to make some shipments for Galveston and Houston via our line, C. & N. W., I. C. and Cotton Belt, and requested him to order refrigerator cars for these shipments."

Robert B. Manli, secretary of appellee, testifies: "At the earnest solicitation of Mr. Shank, we consented to change our shipments by way of North Western, I. C. and Cotton Belt, provided they would furnish refrigerator cars. We were using refrigerator cars, and he said if we would ship over his line he would see that we were furnished refrigerator cars and give us as good delivery and as prompt shipment as we were then getting, and would make arrangements with the local agent at Elgin for the N. W. R. R. and see that I. C. refrigerator cars were in the yards at all times. He said he represented the Cotton Belt route and would furnish us cars. They were furnished under his arrangements. After that all shipments were made over his line, or connecting lines, in I. C. refrigerator cars. He said the shipments would go through in cars without change."

Emory B. Watson, the agent of the North Western at Elgin, testifies that Shank stated to him that he had made arrangements with the Elgin Condensed Milk Company to make some shipments for Galveston and Houston by " our line, C. & N. W., Ill. Cen. and Cotton Belt, and requested me to order as soon as possible Ill. Cen. refrigerator cars for their shipments; that we should keep on hand at all times Ill. Cen. refrigerator cars so as to be ready to make these shipments; that by his request such cars were kept on hand for this purpose."

The jury passed upon this testimony and found that a contract was made as alleged. Circumstances in evidence corroborate the testimony of Manli. It is not likely that appellee would leave a satisfactory route, which furnished them refrigerator cars, without charge, through to Galveston, for one that furnished refrigerators in the North with no agreement to furnish them in the South. It is also a strongly corroborating circumstance that Shank, after the conversation with Manli, saw Watson, the N. W. agent at Elgin, and made arrangements that Ill. Cen. refrigerator cars should always be on hand for appellee's shipments, and that they always were so kept on hand, and shipments made in them.

That the milk was changed on appellant's line from refrigerator cars, in which it was shipped, into box cars, is not denied.

Was it damaged thereby? The jury have found that it was, and there is evidence to support their finding.

Counsel for appellant, in his argument, states that car 16346, 380 cases milk, shipped May 8th, arrived at Cairo May 11th, contents transferred to S. W. car 5750 at and left Texarkana May 15th, arriving at Galveston May 18th; car 16210, 400 cases, shipped June 8th, arrived at Cairo June 11th, transferred into South Western car 8038 at and left Texarkana June 13th, arriving at Galveston June 16th; car 16481, 410 cases, shipped June 27th, arrived at Cairo June 29th, transferred into S. W. car 9234 at and left Bird's Point June 30th, arriving at Galveston July 4th.

Accepting these dates as correct, the milk was in the box cars about three days. It certainly is somewhat remarkable that milk warranted to keep for months in a hot climate should spoil in a box car in three days, but the testimony of unimpeached and uncontradicted witnesses is to the effect that it did spoil. Ujffy, a dealer in condensed milk for twenty years testifies: "My attention having been called to the condition of the previous car, 5750, by the numerous complaints from the city, I examined the contents of the two following cars upon their arrival here and found them more or less lumped."

The meaning of "upon" in this connection is, "at the time of" and not at some indefinite time thereafter, as suggested by counsel for appellant. Ujffy further testifies that efforts were made to dispose of the milk; that it was sent out to wholesale dealers and that 662 cases of the milk received in the three cars were returned, and could not be sold at any price; that it was unmerchantable, lumpy and discolored.

A strongly corroborative circumstance is that Ujffy, who was appellee's consignee, notified Becker, the general agent of the I. & G. N. R. R., the delivering road at Galveston, of the damaged condition of the milk. The returned cases were for months stored at the station of said road.. The following letter, marked "Exhibit 2," shows that appellant was also notified:

"COTTON BELT ROUTE.

C. A. SHANK, General Agent.

L. D. KNOWLES, Trav. Freight Agent.

W. A. NEWELL, Contracting Agent.

Office of General Agent St. Louis South Western Railway Co.; St. Louis South Western Railway Co., of Texas; Tyler South Eastern Railway Co.; Room 4, Rookery, Telephone Main 3956.

CHICAGO, ILL., July 1, 1893.

ELGIN CONDENSED MILK Co.

Gentlemen: Replying to your favor of the 6th inst., and returning copy of letter from Mr. M. S. Ujffy, will ask that as soon as you receive a complete report from Mr. Ujffy as to the condition of the car upon its arrival, you send same to me promptly and I will take up with our St. Louis office and have a complete investigation made as to who is responsible for the loss and damage.

Thanking you for past favors, I am,

Yours truly,

C. A. SHANK, General Agent."

It is significant that with this notice, and with the 662 cases at the railroad warehouse, where it could have been examined, no testimony is introduced by appellant rebutting Ujffy's statements.

What is the measure of damages? Ujffy testifies that the market value of the 662 returned cases was $2,425.50; that they could have been sold for that if not damaged. The charges for storage were $59.40, making a total of $2,484.90. It was in evidence that efforts were made without success to sell it at Galveston; that it could not be sold there at any price; that it was finally sold to the Lancaster Caramel Company, of Pennsylvania, the only purchaser that could be found for damaged milk, and netted $231, leaving a balance of $2,253.90, the amount of the judgment. There was no rebutting evidence as to the amount of damages and the sum fixed by the jury is in accordance with the testimony before them.

Many objections were urged by appellant against testimony admitted by the court. Without noticing them specifically, it may be said that no material error appears when all the evidence is considered. The witnesses who testified as experts fairly qualified themselves as such by the showing made of their experience and knowledge of the business.

The statements of Shank, as an agent of appellant, while engaged in the business of appellant, about and concerning which the statements were made, were admissible against appellant.

If the parol contract existed as alleged, the terminal road at Galveston was an agent of appellant in receiving, hauling and delivering the milk, and its agent, Becker, to this extent became the agent of appellant. The testimony is that the original bills of lading were given to him by Ujffy; that demand was made for their return, and that being mislaid or lost by him, they were not returned. It was not error to admit copies.

Appellant insists that if there had been an antecedent parol agreement by appellant, that it was superseded by subsequent arrangements, as expressed in the bills of lading. There would be force in this argument if this suit was against the North Western road that issued the bills of lading. But it is not. The N. W. road is not charged with

making the contract sued upon. We see no reason why the N. W. R. R. Co. might not limit its liability, without affecting an antecedent contract made with appellant.

By the first instruction for plaintiff, the jury was told as to the measure of damages: "If you further believe from a preponderance of the evidence herein that said condensed milk was damaged and injured by reason of such transfer of it from the refrigerator cars above described, into box cars, and so transported it in box cars, you should assess the plaintiff's damages at such sum as you may find from the evidence herein it has sustained, if any, by reason of such transferring of said condensed milk from said refrigerator cars, and transporting it a part of the way in box cars."

If the words "plaintiff sustained" had been used, instead of "it had sustained," the instruction would have been clearer. But as it is, there is nothing misleading in it. The damage to the milk was in effect the damage that plaintiff sustained.

Instruction 19, for defendant, states the law correctly, and if there had been testimony introduced tending to show that the milk could have sold to a better advantage at some place nearer to Galveston, it would have been error to refuse it. But there was no such testimony. The jury applied the rule stated in the instruction in fixing the amount of damages, upon the sale at Lancaster, and for anything appearing in the evidence, the court can not presume a sale could have been made at any nearer place.

The 20th instruction asked by appellant is: "If the damaged milk was, after its arrival at Galveston, delivered to and received by plaintiff, then plaintiff could not, by returning the milk to the railroad company at Galveston, relieve itself of the responsibility and duty to defendant as respects disposition of such milk."

This instruction, under the evidence, was properly refused. The evidence shows that plaintiff did try to dispose of the milk; that it could not be sold at Galveston at any price, and that both the delivery road and appellant were notified,

and that appellant promised (see letter, dated July 10, 1893, *supra*) to investigate the damage; that subsequently it was sold by appellee for the best price that could be secured for it.

For the same reasons, instructions 21 and 22 were properly refused.

The 25th refused instruction was to the effect that if no contract had been made with the appellant through its agent, Shank, then the bills of lading were the initial contracts, and that under them the plaintiff could not recover.

The jury had been clearly told in other instructions that a recovery could only be had upon proof of a parol contract with appellant. It was not sought to recover upon the bills of lading, and reference to them in this respect was leading the jury to consider them for a purpose not involved in the suit.

We find no error in the modification of appellant's instructions 3, 11 and 14.

While the alleged cause of damage is apparently disproportionate to the result, the case appears to have been fairly tried upon evidence, if not rebutted, sufficient to sustain the verdict.

We see no adequate reason for interfering with the finding of the jury.    Judgment affirmed.